UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>FACEBOOK USER ID:<br><br>1673921407 | Case No. _____6:21mj26_____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017. I am also a Detective with the Lynchburg Police Department (Virginia) and be been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office.

1

My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources. These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations. During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations. I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

3. The facts in this affidavit come from my own investigation, observations, training and experience, and information obtained from other law enforcement officers and witnesses, including members of the gang under investigation and their associates. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Dashonna Farmer ("FARMER") is engaged in violations of 18 U.S.C. § 1503 (obstruction of justice) and 18 U.S.C. § 1512(c) (tampering with proceedings). There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband, or fruits of these crimes, as described in Attachment B.

## **PROBABLE CAUSE**

5. The United States, including the Drug Enforcement Administration ("DEA"), is investigating acts of obstruction of justice and witness tampering. The government's investigation concerns the dissemination and sale of DEA reports that contain witness statements for the purpose of witness intimidation and to obstruct the government's investigation.

6. There is probable cause to believe that the Facebook Account, 1673921407, further described in Attachment A ("SUBJECT ACCOUNT"), contains evidence of this activity. The SUBJECT ACCOUNT is believed to be owned by Dashonna Farmer ("FARMER") who is believed to be engaged in the sale of the DEA reports.

### **The Pending Proceedings**

7. On January 26, 2021, a grand jury in the Western District of Virginia returned an indictment charging individuals with drug distribution crimes in case number 6:21-CR-1.

8. Some of the evidence in that case included statements made by a Cooperating Defendant ("CD-1") who was facing charges in the Western District of Virginia. Starting in December 2020, CD-1 began providing law enforcement with intelligence regarding CD-1's direct and indirect knowledge and involvement of criminal activity. That intelligence was documented by this affiant in DEA reports.

9. As part of that case, the United States provided discovery to the charged defendants, through their counsel. This disclosure included the reports of CD-1's statements.

10. The reports were provided in a redacted format, pursuant to a pending a Motion for a Protective Order filed in the case. The discovery was also subject to a protective order entered by the Honorable Senior United States District Judge Norman K. Moon. The protective order provided that counsel could not leave copies of discovery with the defendant. Further

counsel and defendants were ordered to only use the discovery for preparation for trial and not to further disseminate the discovery.

11. Only law enforcement, counsel for CD-1, and the defendants charged in 6:21-CR-1, through their counsel, have access to the DEA Reports concerning CD-1.

**Evidence of Leaked Reports**

12. On June 25, 2021, law enforcement received information from CD-1 in regards to how "paperwork… was leaked" on Facebook. CD-1 advised that the "paperwork" had information on it that was previously provided to law enforcement by CD-1. CD-1 quoted specific names to law enforcement that were named on the "paperwork."

13. On June 28, 2021, law enforcement spoke with a Confidential Source (hereafter "CS-1") regarding an individual who was selling digital photographs of reports, written by law enforcement, through Facebook Messenger. CS-1 provided law enforcement the digital copies of those photographs. CS-1 advised that CS-1 received those digital copies from an unnamed person. CS-1 provided law enforcement with those digital copies. CS-1 had previously provided law enforcement with reliable information.

14. This affiant analyzed those digital copies and recognized the digital copies as being photographs of DEA reports previously written by this affiant concerning CD-1's statements. These reports were redacted in the same manner they had been disclosed in case number 6:21-CR-1

15. CS-1 advised that the unnamed person in which CS-1 received the digital copies from was purchased from the user of Facebook profile named "Dashonna Fitzgerald," the SUBJECT ACCOUNT. The user of the SUBJECT ACCOUNT also cautioned the purchaser with the following message, "Don't send it around because it might get in the wrong people

inbox this case is still open and you could catch federal charges behind it." CS-1 provided this affiant with a digital image of the message. Based on the image, it appeared that the user of the SUBJECT ACCOUNT used Facebook messenger to send the message.

16. CS-1 provided this affiant with a photograph of the Facebook account that sold the digital photographs. This affiant queried that account and found portions of the account to be open for public review. This affiant immediately recognized the photographs and videos posted by the user of the account to be Dashonna FARMER. This affiant has had firsthand contact with FARMER on multiple occasions. This affiant knows FARMER to go by the alias of "Cookie". This profile is the SUBJECT ACCOUNT.

17. On July 1, 2021, this affiant conducted an interview of CD-1 regarding their knowledge about the dissemination of the aforementioned digital photographs. CD-1 advised that CD-1 had received information that Co-Conspirator #1 ("CC-1") provided FARMER with the digital photographs of the DEA reports. CD-1 advised that FARMER was then selling the digital photographs to individuals via Facebook Messenger. CD-1 advised that FARMER was receiving payment from individuals via the online wireless money transfer application called CASH APP.

18. CC-1 is a defendant charged in 6:21-CR-1. CC-1 is released on bond of the Court.

19. On July 1, 2021, this affiant received a copy from an unidentified individual of a conversation using Facebook Messenger between the SUBJECT ACCOUNT and an unidentified individual. In that conversation, the user of the SUBJECT ACCOUNT instructed the other party of the conversation to send $50 to them via Cash App to the account "$dashonnaf." The name on listed on that account was "DaShonna Farmer".

20. This affiant spoke with the individual who sent this affiant the copy of the Facebook Messenger conversation. That individual advised that he/she had exchanged those

messages with the user of the SUBJECT ACCOUNT. The individual advised that he/she requested to purchase the report(s) that the user of the SUBJECT ACCOUNT was selling. The individual advised that he/she was provided the aforementioned Cash App account to purchase the digital reports for $50. The unidentified individual advised he/she was providing the intelligence described in this paragraph on behalf of CD-1. This individual would not provide their identity to law enforcement.

21. Cash App is an application/service that, among other things, allows users to send and receive payments. Cash App is managed by Square, Inc.

22. On July 9, 2021, this affiant served a grand jury on Square, Inc. for records related to the Cash App identifier, also known as a "cashtag," of "Dashonnaf."

23. Square, Inc. responded to the grand jury subpoena on July 30, 2021.

24. The records provided by Square, Inc. state that the "cashtag" of "Dashonnaf," is registered to Dashonna Farmer with date of birth, 11/4/1985, last four digits of her social security number 6557, phone number 336-912-7787, and an address of 2407 Phillips avenue, G, Greensboro, NC 27405. This information matches law enforcement records of FARMER's identifying information.

25. The records provided by Square, Inc. also show transactions and payments in which "Dashonnaf" was involved. Some of these transactions included the following:

    a. On June 25, 2021, at 2:46 pm UTC (which corresponded with 10:46am EDT), a user named "Alysia" sent "Dashonnaf" $5.00 with the subject "👀."

    b. On June 25, 2021, at 2:51 pm UTC (which corresponded with 10:51am EDT), a user named "Short Stuff" sent "Dashonnaf" $5.00 with the subject "PAPERWORK ."

c. On June 25, 2021, at 2:57 pm UTC (which corresponded with 10:57am EDT), a user named "Dre Jones" sent "Dashonnaf" $4.00 without a subject.

d. On June 25, 2021, at 4:13 pm UTC (which corresponded with 12:13pm EDT), a user named "Nadege Elliott" sent "Dashonnaf" $5.00 with the subject "this ick."

e. On June 25, 2021, at 4:51 pm UTC (which corresponded with 12:51pm EDT), a user named "Carolyn Boahene" sent "Dashonnaf" $3.00 without a subject.

f. On June 25, 2021, at 4:58 pm UTC (which corresponded with 12:58pm EDT), a user named "Nakida" sent "Dashonnaf" $3.00 with the subject "for paperwork."

g. On June 25, 2021, at 6:27 pm UTC (which corresponded with 2:27pm EDT), a user named "Tabitha Hall" sent "Dashonnaf" $3.00 without a subject.

h. On June 25, 2021, at 7:20 pm UTC (which corresponded with 3:20pm EDT), a user named "Latricia" sent "Dashonnaf" $3.00 with the subject "being nosey 😉."

i. On June 25, 2021, at 7:28 pm UTC (which corresponded with 3:28pm EDT), a user named "Breonna Wade" sent "Dashonnaf" $3.00 with the subject "paperwork."

j. On June 25, 2021, at 7:29 pm UTC (which corresponded with 3:29pm EDT), a user named "Tyronza Moore" sent "Dashonnaf" $3.00 without a subject.

k. On June 25, 2021, at 10:56 pm UTC (which corresponded with 6:56pm EDT), a user named "Carolyn Boahene" sent "Dashonnaf" $5.00 without a subject.

l. On June 25, 2021, at 11:02 pm UTC (which corresponded with 8:02pm EDT), a user named "Gloria Smith" sent "Dashonnaf" $6.00 with the subject "gloria."

    m. On June 26, 2021, at 3:00 pm UTC (which corresponded with 11:00am EDT), a user named "Lakisha Anderson" sent "Dashonnaf" $7.00 without a subject.

    n. On June 26, 2021, at 6:37 pm UTC (which corresponded with 2:27pm EDT), a user named "Bri Nicole" sent "Dashonnaf" $10.00 without a subject.

26. The records provided by Square, Inc. show that FARMER received multiple payments for between $3 and $5 for "paperwork" on the same date that CD-1 reported DEA Reports were being circulated via Facebook.

27. Based on the foregoing, there is probable cause to believe that the SUBJECT ACCOUNT contains evidence of FARMER's distribution of DEA reports and efforts to obstruct justice and tamper and intimidate witnesses.

28. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

29. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

30. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

31. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

32. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

33. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

34. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

35. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

36. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

37. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

38. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

39. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

40. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

41. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

42. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like

Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account

activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

44. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

46. Based on the foregoing, I request that the Court issue the proposed search warrant.

47. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

48. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

49. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

       *s/Daniel Bailey*
       Daniel Bailey, Task Force Officer
       Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this  2nd  day of August 2021.

*Robert S. Ballou*
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE